**[J-95-2024] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| CENTER FOR COALFIELD JUSTICE, WASHINGTON BRANCH NAACP, BRUCE JACOBS, JEFFREY MARKS, JUNE DEVAUGHN HYTHON, ERIKA WOROBEC, SANDRA MACIOCE, KENNETH ELLIOTT, AND DAVID DEAN | : : : : : : : | No. 28 WAP 2024<br><br>Appeal from the Order of the Commonwealth Court at No. 1172 CD 2024, entered on September 24, 2024, affirming the Order of the Washington County Court of Common Pleas at No. 2024-3953, entered on August 27, 2024. |
| v. | : : : | |
| | : | SUBMITTED: October 11, 2024 |
| WASHINGTON COUNTY BOARD OF ELECTIONS, REPUBLICAN NATIONAL COMMITTEE AND REPUBLICAN PARTY OF PENNSYLVANIA | : : : : : : : | |
| APPEAL OF: REPUBLICAN NATIONAL COMMITTEE AND REPUBLICAN PARTY OF PENNSYLVANIA | : : : : | |

**DISSENTING OPINION**

**JUSTICE BROBSON**                          **DECIDED: SEPTEMBER 26, 2025**

For the reasons set forth in my dissent in *Genser v. Butler County Board of Elections*, 325 A.3d 458 (Pa. 2024), *cert. denied sub nom. Republican Nat'l Comm. v. Genser*, 145 S. Ct. 2778 (2025), I respectfully dissent here as well. The Majority and I have a fundamental disagreement as to how we interpret the provisions of the Pennsylvania Election Code (Election Code)[1] relative to how electors "vote" in elections, the circumstances under which an elector who has requested and received a mail ballot

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2601-3591.

may vote provisionally at the elector's polling place on election day, and how county boards of elections determine whether to count a vote cast either in person (official or provisional) or by mail (mail-in or absentee). Those disagreements are just as prevalent in this matter as they were in *Genser* and, therefore, form the foundation of my disagreement with the Majority's disposition here. Although I have additional concerns about the Majority Opinion, the concerns raised below, I believe, are most noteworthy.

Initially, I note that the Majority, in pursuit of its desired result, takes liberty with this Court's ruling in *Genser*, just as it did in *Genser* with this Court's decision in *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020). *Genser*, 325 A.3d at 498 (Brobson, J., dissenting). Specifically, the Court in *Genser* held that "naked" mail ballots—*i.e.*, ballots that are determined during the pre-canvass and canvass as missing the statutorily required secrecy envelopes—are "void" under Section 1308(g)(4)(ii) of the Election Code, 25 P.S. § 3146.8(g)(4)(ii). Because these naked ballots are void, the *Genser* Court's reasoning goes, they were never "received" and, thus, the elector never voted. In that circumstance, if the elector also cast a provisional ballot on election day, the county board of elections must count the provisional ballot because a "void" ballot was never cast. *Id.* at 477-80 (majority opinion). As the Court held in *Genser*, "[o]nce the [Butler County Board of Elections] confirmed that [the e]lectors' ballots were void, . . . the [Butler County Board of Elections] was required to count [the e]lectors' provisional ballots." *Id.* at 480.

*Genser* indisputably dealt only with naked ballots and relied specifically on the use of the term "void" in Section 1308(g)(4)(ii) of the Election Code as the foundation of its legal rationale. Yet, the Majority here cites *Genser* for a much broader proposition, claiming, incorrectly in my view, that *Genser* applies to all mail ballots disqualified during the pre-canvass or canvass, *regardless of reason*: "Our core determinations in *Genser*

. . . were that a submitted mail-in ballot packet that fails to satisfy the mandatory requirements of the Election Code is a legal nullity and that qualified electors have a statutory right to have their provisional ballots counted if no other ballot can be legally attributed to them." *Ctr. for Coalfield Just. v. Washington Cnty. Bd. of Elections*, __ A.3d __ (Pa., No. 28 WAP 2024, filed Sept. 26, 2025), slip op. at 33-34. As rooted as *Genser* was in statutory language relative only to secrecy envelopes, the Majority here fails to cite to any language in the Election Code that expressly renders the ballot with a defective declaration envelope, like a ballot that has marks on the secrecy envelope, "void." Both the limited holding in *Genser* and its rationale provide no footing for the Majority's purported recapitulation of *Genser's* "core determinations" and use of the same to justify its decision in this matter.

Next, while I certainly agree with the Majority that we must not condone county board of elections officials misleading voters on how to exercise their right to vote any more than we should condone such misleading communications by the Department of State (Department), I believe that the Majority's characterization of the Washington County Board of Elections' (Board) actions fails to appreciate the tension between the directives of the Election Code and the guidance provided by the Department. The Majority notes that the Board entered the following code into the Statewide Uniform Registry of Electors (SURE) system when it received what the Majority refers to as the elector's return packet: "Record – Ballot Returned." *Id.* at 41-42. The Majority explains that the Board's entry of that code "triggered a SURE email to the elector confirming the Board's receipt of the return packet;" the email provided:

> If your county election office identifies an issue with your ballot envelopes that prevents the ballot from being counted, you may receive another notification. Otherwise, you will not receive any further updates on the status of your ballot and you are no longer permitted to vote at your polling place location.

*Id.* at 41 (emphasis omitted) (quoting Parties' Joint Stipulation, dated 10/9/24 (Joint Stipulation), Ex. D, at 10). The Majority characterizes those actions—*i.e.*, the entry of the "Record – Ballot Returned" SURE code—as "affirmatively misinform[ing]" those electors who may have had their return packets "segregated for a disqualifying error." *Id.* at 41, 43. The Majority also implies that the Board knowingly misinformed electors by entering that SURE code because it knew that the entry of such code would result in the above-quoted SURE email being sent to electors. *Id.* at 42. The Majority suggests that the Board should have, instead, used the more specific "CANC" codes, which, according to the Majority, would have triggered a different SURE email that would have alerted electors of a potential problem with their return packets and informed them that they could proceed to their polling place on election day and cast a provisional ballot. *Id.* The Majority, however, ignores that the appropriate SURE code was, in fact, "Record – Ballot Returned," because the Board has no authority to cancel or disqualify a ballot under the Election Code prior to the pre-canvassing and canvassing process. *See* Section 1308 of the Election Code, 25 P.S. § 3146.8. Moreover, the Majority admits that the CANC codes "were not perfect" and would not have provided the affected electors with any relief in this case. *Id.* at 43 n.42. This is because the CANC codes themselves could have generated an incorrect email advising electors that they could vote by obtaining a new ballot or by casting a provisional ballot at their polling place on election day, when, under the Board's policies, the Board would not have granted a request for a new ballot or counted a provisional ballot if it had already entered the SURE code "Record – Ballot Returned." *Id.* at 42-43 nn.41-42. The Majority essentially accuses the Board of knowingly and "affirmatively misinform[ing]" electors by using a SURE code that generated an inaccurate email, while simultaneously suggesting that the Board should have used a SURE code that would have generated an email that would advise electors to take actions, which,

under the Board's policies, would not provide those electors with any relief at all. *Id.* at 41-42.

The Majority's criticism of the Board's actions is colored by the Court's subsequent decision in *Genser*. The Board, however, would have had to exercise Nostradamus-like powers before the 2024 Primary Election to foresee the Court's decision in *Genser*, let alone the Court's broadened reading of that decision to apply to the circumstances here. The Board, in administering its duties under the Election Code with respect to the 2024 Primary Election, did not have a crystal ball with which it could view the future. The outcome in *Genser*, as evidenced by the 4-3 division of the Justices, was far from pellucid.

Instead, at all times relevant, the Board had available to it three at least arguably contradictory directives: (1) the Election Code; (2) our decision in *Pennsylvania Democratic Party*; and (3) non-binding guidance from the Department. Specifically, Section 1307-D(b)(5) of the Election Code, 25 P.S. § 3150.17(b)(5), requires, in part, the Board to record "[t]he date on which the elector's completed mail-in ballot is received by the county board" of elections, and Section 1210(a.4)(5)(ii)(F) of the Election Code, 25 P.S. § 3050(a.4)(5)(ii)(F), prohibits the counting of an elector's provisional ballot if "the elector's [mail] ballot is timely received by a county board of elections." As for this Court's decision in *Pennsylvania Democratic Party*, not only did we hold that "the secrecy provision language in Section [1306-D(a) of the Election Code, 25 P.S. §] 3150.16(a)[,] is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid," but, more important to the matter here, we also held that county boards of elections "are not required to implement a 'notice and opportunity to cure' procedure for mail-in and absentee ballots that voters have filled out incompletely or incorrectly." *Pa. Democratic Party*, 238 A.3d at 374, 380.

In reaching the latter conclusion, we explained that there was "no constitutional or statutory basis that would countenance" having the county boards of elections "contact those individuals whose ballots the [b]oards have reviewed and identified as including 'minor' or 'facial' defects . . . and then afford those individuals the opportunity to cure defects." *Id.* at 374. Section 1307-D(b)(5), Section 1210(a.4)(5)(ii)(F), and the other sections of the Election Code I focused on in my dissent in *Genser* can be read in harmony with these holdings from *Pennsylvania Democratic Party*. The Department's non-binding guidance and changes to the SURE system, designed to provide a mechanism for county boards of elections to notify electors of defective mail ballots for the purposes of effectuating the equivalent of a cure, are, at least arguably, incongruent with both the Election Code and *Pennsylvania Democratic Party*. In other words, prior to *Genser*, one could reasonably view the Department's guidance and changes to the SURE system to be untethered to the Election Code and not required by *Pennsylvania Democratic Party*. In fact, one could reasonably interpret *Pennsylvania Democratic Party* as providing the opposite—*i.e.*, that county boards of elections could not be required by the Department to provide opportunities for "notice and cure" procedures in the face of defective mail ballots.

Confronted with the above lack of clarity in April 2024, the Board, as I did in my dissent in *Genser*, chose to apply the text of the Election Code in a straightforward manner—*i.e.*, interpreting the word "received" in the traditional sense, while likely also acknowledging that this Court in *Pennsylvania Democratic Party* held that notice to electors of ballot defects prior to the conclusion of the canvass was neither statutorily nor constitutionally required. Had this interpretation of the Election Code prevailed in *Genser*, the Board's notification to recipients of mail ballots—that if the Board received an elector's mail ballot, the elector would be prohibited from voting at the polls—*would then have been*

*true* pursuant to Section 1306-D(b)(1) of the Election Code, 25 P.S. § 3150.16(b)(1).[2]

Similarly, the Board's action of only recording receipt of the mail ballot in the SURE system *would then have been the correct action to take* pursuant to Sections 1306-D(b)(1) and 1307-D(b)(5) of the Election Code.[3] The Board's pre-*Genser* conduct in this regard not only adhered to these Election Code provisions but also preserved the integrity *and confidentiality* of the pre-canvassing and canvassing processes set forth in Section 1308(g)(1.1) and (2) of the Election Code, 25 P.S. § 3146.8(g)(1.1), (2).[4]

---

[2] "Any elector who receives and votes a mail-in ballot . . . shall not be eligible to vote at a polling place on election day." 25 P.S. § 3150.16(b)(1).

[3] "The district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place . . . ." 25 P.S. § 3150.16(b)(1). "[T]he county board [of elections] shall maintain a record of . . . [t]he date on which the elector's completed mail-in ballot is received by the county board" of elections. 25 P.S. § 3150.17(b)(5). *See also Genser*, 325 A.3d at 489-90, 494-95 (Brobson, J., dissenting).

[4] These statutory provisions prohibit pre-canvassing and canvassing activities until the day of the election, as fully discussed in my dissent in *Genser*. The Majority attempts to distinguish between the type of inspection and segregation by election office staff before election day that happened here and the pre-canvass and canvass that happens under the Election Code. *Ctr. for Coalfield Just.*, slip op. at 61-63. Basically, the Majority reasons, relying solely on the statutory definition of "pre-canvass," that an inspection of ballots alone does not constitute a "pre-canvass." Section 102 of the Election Code, 25 P.S. § 2602 (definitions of "canvass" and "pre-canvass"). Statutory definitions are to be used when construing substantive statutory provisions, but they are not substantive provisions unto themselves.

The substantive statutory provisions relating to when and how county boards of elections conduct the pre-canvass and canvass are set forth in Section 1308(g)(1.1)-(4) of the Election Code, 25 P.S. § 3146.8(g)(1.1)-(4). The first step in the pre-canvass and canvass is an inspection of the declaration envelope to determine its sufficiency. 25 P.S. § 3146.8(g)(3). As this Court has explained: "[I]n determining whether the declaration is 'sufficient' for a [mail] ballot at canvassing, the county board [of elections] is required to ascertain whether the declaration on the return envelope has been filled out, dated, and signed." *In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 608 (Pa. 2020). If the declaration envelope does not pass this sufficiency review, then the ballot does not proceed to the next phase—*i.e.*, the declaration envelope will not be opened. *See* 25 P.S. § 3146.8(g)(4)(i). Accordingly, statutory definition notwithstanding, declaration envelope
(continued…)

For the above reasons, the Majority's characterization/criticism of the Board's actions is harsh, unfair, and unwarranted. Moreover, the Majority fails to acknowledge that the actual misinforming here occurred as a result of the email generated by the SURE system once the Board entered the only code it could have possibly entered under the circumstances. When the Board selected the code "Record – Ballot Returned" for the ballots in question, it entered into the SURE system the only information it was required (or authorized) to enter under the Election Code—*i.e.*, that it received a mail ballot. The other codes created by the Department, by the Department's own admission, did not apply to the ballots in question.[5]

---

inspection is part of the pre-canvass and canvass, and ballots that do not pass this stage are never opened and counted.

Far from "cherry-pick[ing]," my analysis of the pre-canvassing and canvassing process is based entirely on the express language of the Election Code. *Ctr. for Coalfield Just.*, slip op. at 62 n.56. Tellingly, the Majority cites no authority to support its expanded conception of the pre-canvass—what it refers to as "administrative handling." *Id.* Indeed, the Majority's "administrative handling" is part of the pre-canvassing and canvassing process itself—a fact the Majority entirely ignores. *See* Section 1308(g)(3) of the Election Code, 25 P.S. § 3146.8(g)(3). Essentially, in an effort to reach its desired result, the Majority is putting its favored practice ahead of the Election Code, whereas I choose to give primacy to the clear and unambiguous language of the Election Code. *See* 1 Pa. C.S. § 1921(b).

[5] In addition to the "Record – Ballot Returned" code, which the Board used here, county boards of elections may select codes with the prefix "PEND" for pending or "CANC" for cancelled, noting that there was some determination, preliminary (pending) or final (cancelled), that the mail ballot suffered from some disqualifying defect, be it with the declaration or the secrecy envelope. *Ctr. for Coalfield Just.*, slip op. at 5 n.7, 54 n.50. The Department created the PEND codes specifically for those counties that have implemented "notice and cure," or ballot curing, procedures for mail ballots. (Joint Stipulation, Ex. D at 6-7.) Importantly, neither the Election Code nor the Department mandate the use of any of the PEND or CANC codes, as the Department and the Secretary explain in their *amicus curiae* brief: Counties have complete discretion on *whether and when* to select a PEND or a CANC code[], including after Election Day. The Secretary does,

(continued…)

Both the programming of the SURE system to generate emails based on codes entered by county boards of elections and the contents of those emails were within the exclusive control of the Department and not the Board or any county board of elections for that matter. It was the Department, and not the Board, that programmed the SURE system to generate the email notices to the affected electors. How the Department escapes the Majority's criticism for misinforming the electors, when it was the Department that actually crafted and sent the inaccurate emails, is as troubling as the tone of the criticism the Majority heaps on the Board under the circumstances.

I offer one final, but critical, observation. Since this Court issued its decision in *Pennsylvania Democratic Party*, many, including the Department, have come to believe that county boards of elections may, in their discretion, implement "notice and cure" procedures. This belief is a clear mistaken reading of our decision in *Pennsylvania Democratic Party*, bespeaks ignorance of decades of administrative and governmental law in this Commonwealth, and invites an unequal and nonuniform election.

---

however, encourage counties to accurately update a mail ballot's final status in SURE.

(Dep't/Sec'y Br. at 6-7 (citation omitted).) It is undisputed that the Board decided not to allow ballot curing for the 2024 Primary Election and future elections. (Joint Stipulation ¶¶ 33-35.) Accordingly, even the Department and the Secretary must acknowledge that it would have been inappropriate for the Board employees to use the PEND code for the segregated ballots at issue here. (*See* Joint Stipulation, Ex. D. at 8-9.) What about the CANC codes? According to the Department and the Secretary, these codes are reserved for circumstances where the Board makes a *final* determination to exclude a mail ballot from the count. (*Id.*) The Majority acknowledges that the segregation by the Board employees of the mail ballots at issue in this case was preliminary, at best. *Ctr. for Coalfield Just.*, slip op. at 62 n.55. The *final* Board determination to disqualify the segregated mail ballots occurs during the publicly noticed canvass process conducted by the Board. *See* Section 1308(g)(1.1), (2) of the Election Code, 25 P.S. § 3146.8(g)(1.1), (2).

In *Pennsylvania Democratic Party*, a matter over which this Court exercised its extraordinary jurisdiction,[6] the petitioners sought an order requiring county boards of elections, *inter alia*,

> to . . . contact qualified electors whose mail-in or absentee ballots contain minor facial defects resulting from their failure to comply with the statutory requirements for voting by mail, and provide them with an opportunity to cure those defects. More specifically, [the petitioners] submit[ted] that when the [county boards of elections] have knowledge of an incomplete or incorrectly completed ballot as well as the elector's contact information, the [b]oards should be required to notify the elector using the most expeditious means possible and provide the elector a chance to cure the facial defect . . . .

*Pa. Democratic Party*, 238 A.3d at 372. Stated succinctly, the petitioners asked that this Court order all county boards of elections to implement "notice and cure" policies. Then-Secretary of the Commonwealth Kathy Boockvar (Secretary Boockvar) opposed the requested relief for several reasons. *Id.* at 373. First, she argued that "there is no statutory or constitutional basis for requiring the [county boards of elections] to contact voters when faced with a defective ballot and afford them an opportunity to cure defects." *Id.* Next, responding to the petitioners' reliance on the Free and Equal Elections Clause of the Pennsylvania Constitution,[7] Secretary Boockvar contended that the clause cannot be wielded to add language to the Election Code that the General Assembly chose not to include. *Id.* (citing *Winston v. Moore*, 91 A. 520, 522 (Pa. 1914)). The Secretary argued that, so long as an elector follows the requisite voting procedures for mail ballots set forth in the Election Code, the elector "will have an equally effective power to select the representative of his or her choice." *Id.* (quoting *League of Women Voters v. Com.*, 178 A.3d 737, 809 (Pa. 2018)).

---

[6] *See* 42 Pa. C.S. § 726.

[7] "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5.

Importantly, Secretary Boockvar also questioned the logistics of a court-mandated "notice and cure" procedure where the Election Code is silent on the subject. While conceding that "notice and cure" may be a good policy, Secretary Boockvar maintained that such "logistical policy decisions . . . are more properly addressed by the Legislature, not the courts." *Id.*; *see also Winston*, 91 A. at 522 ("[B]allot and election laws have always been regarded as peculiarly within the province of the legislative branch of government . . . ."). The other respondents' arguments largely tracked Secretary Boockvar's. *Pa. Democratic Party*, 238 A.3d at 373-74.

This Court denied the requested relief, accepting the arguments of Secretary Boockvar and the other respondents. The Court specifically noted that there is "no constitutional or statutory basis" upon which the Court could impose on county boards of elections the "notice and cure" procedure that the petitioners sought. *Id.* at 374. We explained:

> While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the Legislature. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, *it does not provide for the "notice and opportunity to cure" procedure sought by [the petitioners]*. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, *we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature*. We express this agreement particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, *all of which are best left to the legislative branch of Pennsylvania's government*.

*Id.* (emphases added) (citation omitted). In brief, the Court denied relief because: (1) the Election Code did not provide for "notice and cure" procedures; (2) the decision to authorize "notice and cure" procedures was a policy matter for the General Assembly; and, this is particularly true, (3) policy judgments would need to be made both with respect

to "the contours of the procedures" and how such procedures might impact the confidentiality of the canvass.[8]

Since our decision in *Pennsylvania Democratic Party*, some counties have implemented "notice and cure" procedures on their own—*i.e.*, without legislative authorization—while others have not.[9] Of the counties that have, the procedures vary from county-to-county.[10] The Department, under the leadership of the Secretary of the Commonwealth Al Schmidt (Secretary Schmidt), has embraced this county-by-county "notice and cure" system, even going so far as to create codes and automated emails to assist counties in their "notice and cure" efforts. Where in our decision in *Pennsylvania Democratic Party* these counties and the Department discern authority to act in this regard is illusive. We clearly accepted Secretary Boockvar's and the other petitioners' concerns about the policy judgments that would have to be made to enact such procedures and clearly stated that it was a matter for the Legislature (the General Assembly). We clearly and unequivocally said that the Election Code as currently written

---

[8] *See* Section 1308(a) of the Election Code, 25 P.S. § 3146.8(a) (requiring ballots received in sealed declaration envelopes to be placed in "sealed or locked containers until they are to be canvassed"); Section 1308(g)(1.1) of the Election Code, 25 P.S. § 3146.8(g)(1.1) ("No person observing, attending or participating in a pre-canvass meeting may disclose the results of any portion of any pre-canvass meeting prior to the close of the polls."); Section 1308(g)(2) of the Election Code, 25 P.S. § 3146.8(g)(2) ("The county board of elections shall not record or publish any votes reflected on the ballots prior to the close of the polls.").

[9] According to a press release issued by the American Civil Liberties Union of Pennsylvania on October 3, 2024, https://www.aclupa.org/en/press-releases/aclu-pa-releases-county-county-analysis-mail-ballot-processes (last visited September 22, 2025), at least 36 of Pennsylvania's 67 counties offer some opportunity to electors to cure defective mail ballots. The remaining counties do not.

[10] Of the counties that do allow for "notice and cure," the procedures vary, according to an October 23, 2024 report published by Spotlight PA. https://www.spotlightpa.org/news/2024/10/pennsylvania-election-2024-mail-ballot-curing-notice-errors-fix/ (last visited September 22, 2025).

is silent in terms of any authority to provide a "notice and cure" procedure with respect to mail ballots in advance of the canvass.

Perhaps the only thing that these county boards of elections and the Department are hanging their proverbial hats on is that very silence in the Election Code. If so, the theory would be that county boards of elections are free to do anything in the administration of elections within their borders that is *not expressly prohibited* by the Election Code. But this theory runs headlong into decades of well-settled jurisprudence in this Commonwealth. As I noted in my dissent in *Genser*, county boards of elections owe their existence to the Election Code, which both establishes them and prescribes their powers and duties.[11] *Genser*, 325 A.3d at 499-500 (Brobson, J., dissenting). "It is *a priori* that a governmental body such as an election board has only those powers expressly granted to it by the legislature." *Hempfield Sch. Dist. v. Election Bd. of Lancaster Cnty.*, 574 A.2d 1190, 1191 (Pa. Cmwlth.), *appeal denied*, 581 A.2d 575 (Pa. 1990). Relatedly, "[p]rescribed procedures in election matters are creatures of statute and, unless one can point to statutory authority for the course which he chooses to follow, his action is without legal warrant." *In re Gen. Election Luzerne Cnty.*, 94 A.2d 565, 566 (Pa. 1953). Again, these are not new or novel concepts. *See, e.g.*, *Huntley & Huntley, Inc. v. Borough Council of Oakmont*, 964 A.2d 855, 862 (Pa. 2009) ("Municipalities are creatures of the state and have no inherent powers of their own."); *City of Phila. v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004) ("Municipalities are creatures of

---

[11] *See* Section 301(a) of the Election Code, 25 P.S. § 2641(a) (providing that "[t]here shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]"); Section 302 of the Election Code, 25 P.S. § 2642 (providing that "[t]he county boards of elections, within their respective counties, shall exercise, in the manner provided by [the Election Code], all powers granted to them by [the Election Code], and shall perform all the duties imposed upon them by [the Election Code], which shall include" certain powers further enumerated in statute).

the state and have no inherent powers of their own; rather, they possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect." (citations and internal quotation marks omitted)).

As we noted in *Pennsylvania Democratic Party*, there is no provision in the Election Code that commands *or authorizes* county boards of elections to enact their own "notice and cure" procedures and the matter is clearly within the prerogative of the General Assembly to address it through legislation. That should have been the end of it under the Commonwealth's well-settled jurisprudence. That some county boards of elections chose to charge ahead anyway, define their own contours of what a "notice and cure" procedure should look like, and implement their vision for the electors in their county should concern anyone who professes to uphold and defend the Pennsylvania Constitution. Whether your mail ballot or even your provisional ballot is counted should not depend on the county in which you vote.

Our state charter ensures *both equality and uniformity* of elections. Pa. Const. art. VII, § 6 ("All laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State . . . ."). The uniformity protection applies "to matters of procedure, methods and machinery of voting and like matters with respect to electors and voting." *Nutter v. Dougherty*, 938 A.2d 401, 412 (Pa. 2007) (quoting *Cali v. City of Phila.*, 177 A.2d 824, 829 (Pa. 1962)). "To be uniform in the constitutional sense, such a law must treat all persons in the same circumstance alike." *Kerns v. Kane*, 69 A.2d 388, 393 (Pa. 1949). While the Majority does not expect employees of county boards of elections to keep "their eyes shut" when receiving mail ballots, (*Ctr. for Coalfield Just.*, slip op. at 62), I question whether anyone's eyes are open to the readily apparent question of uniformity that is, and has been, in front of all

Pennsylvanians, especially then-Secretary Boockvar and current-Secretary Schmidt, since our 2020 decision in *Pennsylvania Democratic Party.*[12]

Until now, this uniformity question was limited to county-by-county "notice and cure" procedures with respect to defective mail ballots. With this latest leap by the Majority in this case, however, that question now extends to the manner in which county boards of elections process mail ballots. Whether, in the Majority's view, a county board of elections must provide notice of a defective mail ballot and of an opportunity to cast a provisional ballot depends on whether the county board of elections has implemented a procedure—"administrative handling"—to inspect and segregate defective ballots prior to the pre-canvass and canvass. If a county board of elections has not implemented such a procedure, there would be no notification to electors whose ballots are later disqualified during the pre-canvass or canvass due to a defect on the declaration envelope; conversely, if such a procedure is in place, the Majority requires the county board of elections to provide notice of the defect and of the elector's opportunity to cast a provisional ballot at the elector's polling place. Differences in how county boards of elections process mail ballots upon receipt should not lead to such disparate treatment of electors from county to county, but the Majority makes that so today. Like existing county-by-county "notice and cure" practices, the Majority's decision here provides another data point upon which electors can reasonably question whether our elections meet the promise of equality and uniformity guaranteed by our state charter.

---

[12] In my concurring statement in *Republican National Committee v. Schmidt*, 327 A.3d 185, 187 (Pa. 2024), I observed that "important questions [exist] with respect to the authority of county boards of election[s] to create and implement their own 'notice and cure' procedures under the Election Code absent express legislative authority to do so and, if they do, whether the varied 'notice and cure' practices and policies from county[ ]to[ ]county violate Article I, Section 5 and/or Article VII, Section 6 of the Pennsylvania Constitution." *Republican Nat'l Comm.*, 327 A.3d at 187 (Brobson, J., concurring statement) (footnotes omitted).

I, therefore, respectfully dissent.

Justices Wecht and Mundy join this dissenting opinion.